The next case is Oelrich Construction v. PRC Precast. David Darr is here for the appellate, and Demetrius Keteves is here for Oelrich. Mr. Darr, you may begin when you're ready. Good morning, and may it please the court. My name is Joe Darr, and I'm here on behalf of the appellant, PRC Precast, LLC, along with co-counsel Leigh Ann Palmer. Your Honors, today we're here to discuss a subcontractor that was wrongfully terminated from a construction project. And there are two reasons why the district court's judgment in this case should be overturned. One is as to the topic of damages, which were improperly awarded to Oelrich, the party that terminated PRC Precast, because those damages were based on an inadmissible damages summary. And the other topic that was there was as to liability, with the court finding that despite the fact that Oelrich did not provide the required cure notice under the contract, it didn't matter because under the futility doctrine, that action was excused. Therefore, PRC was not wrongfully terminated. That defense was not affirmatively pled as an affirmative defense in this case and was never at issue. In addition, as to liability, there was a wrongful decision or an incorrect decision as to the waiver of PRC's rights under the contract at issue in this appeal. Now, as to the damages, the court in this case awarded essentially two different buckets of damages to Oelrich as the party who terminated PRC. The first bucket are the delay damages that were awarded to Oelrich. And in essence, the court had found that there was around 148 delay to the project caused by PRC. So to determine how much the delay damages were, the court had to look for evidence as to the daily rate of what Oelrich was incurring at the project. Is there any objection to delay damages in the district court? There was, Your Honor, as to, in a couple of different ways. For purposes of this appeal, the biggest one was the objection as to this damages summary that Oelrich had to rely on to try to prove their delay damages. And the key part of that damages summary for Oelrich was they had to show, in essence, what their daily rate was that they were incurring being out of that project during this delay period. So typically for a contractor, that's going to be your extended general conditions, which here, pretty standard, it's going to be your project manager that you have at the job, a superintendent, the guy who's actually in the field supervising the work. And in here, in particular, there was a project engineer category as well and a bunch of other miscellaneous costs that got into this daily rate. Now, the problem here is that this damages summary, when it was introduced, it's simply a one or two-page Excel spreadsheet that the owner of Oelrich put together after we were terminated to calculate what he thought their delay damages would be, in essence, and what their daily extended general conditions costs would be. Now, that wouldn't be a problem, potentially, had Oelrich given us a chance and produced or made available the documents, the cost documents that supposedly were underlying these values that Mr. Oelrich, the owner of the company, had put into the spreadsheet for the project manager, the superintendent, the project engineers, and so on. He admitted during the trial that these cost records were available, you know, things like pay stubs, W-2s, that sort of thing, to show that those amounts were actually paid, but they were never provided, and that's undisputed here. He's on the stand, right, kind of walking through this summary, subject to cross-examination? Yeah, more than walking through it, Your Honor. He was just reading literally off the screen from the spreadsheet he created. Were there objections registered at trial to the manner in which he was presenting his testimony with respect to this spreadsheet? The main objection was at the beginning when they tried to admit the summary, Your Honor. And there is – and, you know, in the briefing from the other side, they say something along the lines of, well, it doesn't matter because Ivan Oelrich, the owner, testified to as his damages. No objection was raised. Therefore, even if there was some issue with it, that objection hasn't waived the testimony as well. But the problem is, is that the initial – we believe the initial objection to the actual document itself is sufficient to maintain that objection. The reality is, is we were over – you know, overruled in that objection for the inadmissible summary. It really wasn't clear why other than the court basically said, well, he can testify as to it. Is that right, Mr. Dahmer? That was me, unfortunately. And I said, yes, if he knows it, right? And at some point, maybe there was a line where it was clear he did or didn't know it, but at that point it seemed as though the court had made its mind up that this document is admissible and, you know, therefore everything flowing from it is fine. And the fact that I cross-examined Mr. Oelrich about these damages, I don't view that as any sort of waiver issue either as to the objection. Can I ask you a question? I know it was a bench trial, but did you – I don't remember seeing this in the record. Did you have to file what the exhibits would be prior to the bench trial commencing? Yes. Yes, Your Honor. Did you file a motion to eliminate them to exclude the summary? Yes. And that was addressed during a pretrial conference call. We only had two objections. It was actually a relatively objection-free trial with the exception that I think it was two objections on my part. And that was one of them, was the summary. And that was something that I believe it got deferred until the trial. Stood up, did the objection again. I got overruled. And off to the races we went. So, you know, that was introduced as a summary. It doesn't seem anyone's debating on either side that this was a summary under Federal Rule of Evidence 1006. Did you have the opportunity to depose the individual who did the summary prior to trial? Yes, Your Honor. I did. Yes, it was Mr. Oelrich. We did a deposition of him. We deposed him. And we asked lots of questions about that. You know, one issue that the district court raised is they said, well, why didn't you file a motion to compel to get the documents? Frankly, that's unencumbered upon my client to try to prove their case. And the burden is on them to prove these damages. But isn't that really, in essence, a trial strategy, which is you hope for the best and you hope if you're not going to present your own damages expert or if you're not going to do the questioning during the deposition, then that's a strategy that you have. I don't remember the exact questions I asked. I do believe there were a lot of questions about this summary, how they got there, you know, how he calculated it, when it was created, which, again, was after we were terminated, that sort of thing. I don't view it as strategy. I had no idea what they were going to do to prove their damages. I know how I would have done it, but I'm the construction lawyer. That's all I do. And this isn't something that's real surprising. I'm not some construction law genius here. And we're talking about typical documents that people prove these sort of costs. Like I said, pay stubs, W-2s, internal accounting software for the company to show that these amounts were actually paid. For whatever reason, they never did that. And to get back to that. Can I just ask you a quick question about this? So you make the ‑‑ you depose him, you make the motion in limine about the summary, and then renew that at trial. He gets on the stand, starts walking through, or as you say, reading the summary, and there's no objection at that point. I mean, it just strikes me that his testimony is evidence. It might be like wheat cheese evidence, but it is evidence. You know, the documents would have been better. But, I mean, we can't really say that there's no evidence supporting the summary, right? Or sort of providing a foundation, corroborating the summary. He's on the stand testifying. So that's summary, right? I don't understand how someone reading from an inadmissible document somehow makes their testimony admissible because it was written from the document. That's kind of how I view it. I mean, you're right. It is definitely wheat cheese testimony. I'm not here to fight about whether that wheat cheese was enough or not for the court to find against us. Obviously, that's going to be a losing proposition. But I don't see how reading from that document made it admissible testimony when this was an improperly admitted summary. Also, I will point out that even if that testimony was admissible and it would be insufficient under Florida law to support the award of damages here, because Mr. Oldridge, the owner of Oldridge Construction, he admitted that these values were all based on estimates of what he thought the job was going to cost when they bid on it prior to actually doing the work. So there are Florida cases that are not spot on on this. But generally, estimates are frowned upon as a way to try to prove your damages, in particular in construction cases, especially where the actual cost figures are available to the person that has the burden to prove their damages, which they admitted they had it here. And again, it wasn't a trial tactic, Your Honor, but for whatever reason, they didn't put on those documents. I'm not sure why. And then to the second category of damages that were awarded were the completion contractor damages to hire the next guy to come and finish the work that my client was terminated from completing. Those damages were also improperly awarded because they were based on the only documentary evidence that supported this particular issue was the replacement subcontractor's contract. And that contract said that their contract value was right around $316,000. Ours was $274,000. The difference is, though, our contract broke down the work by the types of work that had to have been done, things like engineering, mockups, shop drawings, mobilization, installation, all those things. Ours was broken down by a schedule of values, which is pretty typical in construction, to show the work and how you got to the final lump sum total you have on your contract. Here, however, the replacement subcontractor's contract spring precast, it only had a lump sum value. There was no way to tell what amounts had been dedicated to all the various types of work that were included in their scope. The reason that's problematic was because in order for the court to basically determine and take into effect that the other side failed to mitigate their damages by not taking the precast pieces that had already been made, the court tried to allocate what should be awarded 100% to All Ridge for Damages and what shouldn't. And they broke it down into three categories. We had setup, manufacture, and installation. And, for example, to take into account of the 53% of pieces of the total we were supposed to make, the judge said, hey, as a manufacturer, I'm only going to give All Ridge 47%. And it's reasonable to make this inference that these are the way they would apportion it in the spring contract. But the problem is, although obviously the district judge is allowed to make those kind of inferences, there was no evidence of how that contract was broken down. Again, the only evidence of that replacement contractor's work, documentary at least, is their contract with a simple lump sum value. So that was an inference that made him require the district court to engage in speculation and guesswork as, yeah, I think roughly it would have been broken down this way, even though there was no evidence as to, say, industry customs. This is how precasters always break down their work. He did the 47% based on, he broke it down into, he found that your client had partially performed 53% of the manufacture of the elements, right? That's correct, Your Honor. 53 plus 47 is 100, so that's, he sort of split the baby in half. Your word's not mine, but, yeah, it seems that's out where we got to eventually. And I'm short on time. If I could real briefly address the futility argument, Your Honors. Is that okay? I'll be very quick. This one's pretty simple. The court found or concluded that, I'm sorry, Ulrich did not wrongfully terminate PRC because although they didn't give the required 24-hour secure period that's in the contract, no one disputes that. It didn't happen. It doesn't matter because under the futility doctrine, the court found that that would have been futile, a futile gesture that you're not required to take under Florida law. The problem with that is that futility was never pled as an affirmative defense in this case, including, obviously, to our counterclaim against them, Ulrich, that they wrongfully terminated the contract by failing to give us the required 24-hour notice. The fact that it wasn't pled… A quick question about that. Futility, it wasn't really a defense to be raised, right? Ulrich is the plaintiff. They sue. You raise failure to notify as a defense. Should they have pre-budded affirmative defense? I guess if we were in Florida State Court, they would have been required probably to file a reply to our affirmative defenses. But that's really not a plagiarism because we have a counterclaim against Ulrich for wrongful termination, breach of contract, to which they should have said part of those allegations were you failed to give 24-hour notice as required under the contract. Then you terminated us without that required notice. That in and of itself is a wrongful termination, breach of contract. That's where your affirmative defense should have been pled. And, frankly, this utility doctrine sort of argument, I think it certainly wasn't on my mind, but I don't think it was on the other side's mind as well. It just came out of the blue. The court sua sponte raised it, which this court has found generally you shouldn't be raising affirmative defenses that aren't… Isn't there evidence in this record, though, that precasts would not have been able to complete performance, so it was too late to cure performance? Well, Your Honor, first of all, obviously, factually, we disagree with that. But regardless of that, what has to be focused on is the purpose of a cure notice in construction. It's not only just showing that you can step up and do it right when they need it. It's also being given the opportunity to avoid where we're at right now by showing an excuse, a valid excuse at that time under the threat of termination. I know you're serious now. Mr. Ford, Ford Davis, when he received the communication from Chris Krehor indicating that they were going to be terminated pursuant to Article 7 of the subcontract agreement, didn't respond. There was nothing. Right. It was found. That was a finding of fact, correct? That was made? I mean, there's no dispute that PRC never responded to this termination. That's correct, Your Honor. As to that particular email, that was not responded to via email. But with that said, again, this goes back to supposed futility in going through with the notice. It wasn't even an issue in the trial. Had it been an issue, had I known, unfortunately, I was the trial counsel for this one, had I known it was an issue, that is something where I would have done my best to put on evidence to show what was going on at that particular moment, why we couldn't have made it happen. And perhaps we could have avoided this whole litigation. I think we have the argument. Thank you, Mr. Dar. Thank you. I appreciate it. Mr. Edebes, am I pronouncing your last name correctly? Yeah. Good morning. Thank you. May it please the Court. Dimitri Edebes for the Apple League, Ulrich Construction Inc. I'll start by answering two questions I heard, Judge Newsom and Judge Wilson, about whether there was an objection to Mr. Ulrich's testimony. And there wasn't. They objected to the summary. They said the summary is inadmissible under Federal Rule of Evidence 1006. And they also said you need an explanation. But they never said, hey, Mr. Ulrich lacks personal knowledge to talk about this. So that issue is unpreserved. Not only is it unpreserved, but they abandoned it in their initial brief, too. Nowhere in their initial brief will you see an argument talking about Mr. Ulrich lacking personal knowledge. Instead, they focus on the summary. And the summary is irrelevant. So, as Judge Newsom noted, we have evidence here. We have Mr. Ulrich's testimony. And that's enough. And the district court recognized that Mr. Ulrich, as president of his company, had knowledge of what the expenses were. And, you know, we had others. That's evident in the testimony, too. For example, Mr. Ulrich was asked about the superintendent's salary. And he said, yeah, that's his actual weekly pay. He also confirmed, you know, we have records on that. We have pay stubs, all of that. So this court doesn't need to decide whether the summary was admissible under Rule 1006. All the time it engages in a harmful error analysis or harmless error. And whether that summary was admissible is harmless because we have this testimony supporting all these damages. And I included a chart in my answer brief pointing to each item of cost and linking that to his testimony. And then as far as the replacement contractor, so, again, this is something that was not raised in the initial brief. In the initial brief, they talk about stacking increases. They rely on Florida law. And we pointed out in our answer brief, well, that law doesn't apply here. Federal law controls and federal law doesn't prohibit stacking increases. So their argument was about stacking. Nowhere in their brief will you see an argument that the inference the district court made was unreasonable or speculative. But even if that argument had been raised, the inference here wasn't speculative. All the district court did was say, look, we have two contracts. This one breaks down the damages. It's reasonable to infer that the other one would have the same allocation. We wouldn't expect two companies in the same industry to have wildly different allocations. So it's a reasonable inference. As far as futility, I don't think this was something we had to plead. But, again, the court doesn't have to reach that issue because it was raised elsewhere. It was raised in a pretrial stipulation. We cited it in our brief. And we also cited case law saying that the pleadings merge into the pretrial stipulation. So it doesn't really matter whether it was raised. We also actually raised it elsewhere as well while I was reviewing the record. So TRC had filed a motion for summary judgment on the issue of lack of notice. And in our response to that motion, we, again, argued that there's a line about futility. This is document 37 of page 17. And I'll quote, in reality, it was immaterial whether Ulrich had given PRC one day, two days, seven days, or 30 days to cure it. So this isn't some issue that they didn't have notice. And the fact is, it would have been futile to give him 24 hours notice. Mr. Prehor, Ulrich's project manager, called Ford Davis, PRC's project manager, and they had a call. He said, can you tell me when you're going to make the panels? No. Again, can you tell me when you can make the panels? No. As the district court found, PRC basically told Ulrich to go pound salt. Giving them 24 hours notice after that conversation would have been futile. And Florida law recognizes that party to a contract doesn't have to take an action that's futile. So the fact that they didn't receive 24 hours notice wouldn't have mattered, and that's what the district court found. Can I ask you one question about one aspect of the completion damages here? Sure. Manufacturing bucket, right? So tell me if I've got this right. The district court says it cost Spring $23,000 and change, right, to outfit the remaining 47%. Right. And so it says you're entitled to the full $23,000 and change as far as the manufacturer damages. Completion. But Spring, if my math is right, would have done the remaining 47% or less. They would have done it for, my math shows, about $20,415. So shouldn't your measure of manufacturer damages have netted out what PRC would have done the work for? What Spring was going to charge for the remaining 47 minus what PRC would have done it for. Instead of getting everything that Spring was going to charge. So the district court actually was really careful about that, and it went through in its order on damages, and it explained why it awarded each component. It said for installation, I'm going to give you 100% of Spring's installation because Spring would have had to do the same installation and setup. Sorry, setup, not installation, for just 47%. So it's the same amount. That's why there's a little more. And then when it came to actual manufacturing the panels, the district court didn't give us everything. It only gave us the 47% of the manufacturer costs. Did it give you, I guess what I'm saying is the full 47, the full cost of what Spring was going to charge for the remaining 47%. And if so, why are you entitled to that much if PRC would have done it for less? So it's like you hadn't already paid PRC that money, had you? We had. I mean, we had paid. Yes. And you weren't getting that money back from PRC? No, the court did offsets and it considered everything, even the unpaid retainage that we never paid. The court accounted for that. So this is all in the district court's second order. I believe it's document 98. So that's what I'm looking at as well. I'll make sure. I mean, I guess what you're telling me makes sense if, but only if you had already paid PRC the $20,415 that they were going to charge you for doing the remaining 47%. And they're keeping it. And so when you need to be made whole, you get everything that Spring was going to charge you. Right. If instead you either hadn't yet paid them the $20,415 or you were getting that back, then you should only get the net as between what Spring was charging, what they were charging. Because think about it. If Spring was going to do it for less, what if Spring said, we'll do it for $10,000? Right. Like saving money. Right. Yeah. So if you look at, it's document 98. It's the district court's second order. And it's page five. So we're looking at the same thing. And it's the top paragraph. And the court said, so there's three components, right? There's installation, there's manufacture, and there's setup. The top paragraph is installation. I'm really only thinking about manufacture. So manufacture, yeah. We had paid, and the court accounted for that payment. And the court only awarded us the 47% of the manufacture price. So we had already paid for the 53%, and then we got the 47%. So Spring's manufacture price was $50,000 and change, right? And then he awarded you 47% of that amount, which was $23 and change. Right, right. We didn't get the whole amount. All right. I'll take it under submission. I'll figure it out. So your honor, can I just ask you a question about the joint pretrial stipend? I just want to, yeah. So. This is obviously joint pretrial step that you, you both submitted for purposes of the bench trial. Right. And in there, it says whether. Provided 24 hours notice was excused from doing so, or whether it would have mattered. And that was part in under PRC's counterclaim. Yeah. The district court knew that that was an issue to be resolved. Right. And the whole issue with pleading and requiring things to be pleaded is to give the other party notice. And that's, that's why courts recognize that if it's in the pretrial stipulation, it doesn't really matter whether it was pleaded. You do the other party has notice of it. Judge Newsome. I'm trying to find. Let me ask you this. You can probably just straighten this out for me. So just so I'm clear, I don't think I understand why it is that you get the full amount of what spring was going to charge you. For the panels. Right. So you've paid for 53, but you haven't paid for the 47. Right. So then I don't think I then understand. Why it is. That you get the full amount of what spring was going to charge you for the remaining 47%. We didn't, we only got, um, we, I know you didn't get a hundred percent, but you got 100% of 47. If that makes sense, you got everything that spring was going to charge you for the remaining 47. And I'm trying to figure out why that is that. That's not true. Okay. All right. So if you, if you look, it's the second paragraph, it's what judge Lagoa quoted. Okay. So it says, you know, The springs menu last sentence springs manufacture price was 50,000. That would be a hundred percent, a hundred percent of everything. We got 47% of that, which was 23,000. So there was no double double dipping there. And you hadn't yet paid PRC or the unmanufactured panels. Right. We only paid for the 53%. We, we never paid the last two payment applications because it was clear that they hadn't made those panels. So what would your damages be? You haven't paid PRC anything yet. And spring says, Oh, Oh, look, we'll manufacture the remaining 47% of the panels for a dollar. Yeah. What would your damages have been then? I mean, you would have, you would have made that made out like gangbusters on the remaining 47% of the contract. Right. Right. I mean, if it was a dollar, that would have been, that would have been, but so, I mean, that's an, that's an extreme example, but in this case, spring said, we'll do it for 20 grand, $20,415. I'm sorry. PRC was going to do it for $20,415. And so if, so I don't, I don't think I understand for the remaining 47% why it is that you shouldn't have to net out what PRC would have done it for. Cause we had to, we couldn't go to PRC. We had to go find someone. You had to, I mean, if I understand correctly, you still had to pay a hundred percent to spring because spring could not manage these panels could not be all the panels had to be done. A hundred percent of the panels had to be done by spring. That's why we didn't get the 53% that you had actually paid for. Right. Those were never delivered to you. Right. They got to keep that money. They kept that. Yeah. And they didn't deliver the product. Right. Correct. I see. So you never got any PRC panels. No, they were still at the time of trial. They were still at PRCs property. Unless there's any other questions, I'll, I'll see the remainder of my time and ask this court to affirm this court's judgment. Thank you. Counsel. Mr. Gar, you've reserved some time for a bottle. So, uh, we were just talking about what they got, what they didn't get with the precast pieces, all rich construction. And, uh, the reality is those pieces never got delivered because as the court found, uh, they failed to mitigate their damages by trying to take delivery. All rich did by taking delivery of the panels and pieces, the concrete that was already made for old rich construction. And, um, I just heard mentioned that they paid for all the pieces that, uh, that PRC had made, uh, that actually wasn't true. And the court found that, uh, there was still a balance out on those pieces of $10,365. That's sort of how we got here to begin with, uh, by not paying full, that is kind of how the wheels fell off. So to speak on this one with PRC, exercising it's right under those no day payment terms that I didn't have time to get to during my main argument, but it's in the briefing. So all the way on that, uh, now as to how the damages were calculated based on, uh, this inference, the judge made with the completion contractor damages that this is an example of under Florida law of the party trying to claim damages, not meeting their burden of proof that was there's again, this isn't a real sort of a genius play on my part, but how I would have done it was, was by having ideally the replacement subcontractors representative testify. This is how we broke it down. This is what we did. And if he doesn't want to show up to court, well then at least when I got their documentation, showing real simple things like a schedule of values. And I'm sure it's spring probably submitted, which usually most subs do have to submit to get paid every month. Here's what I've done this month, general general contractor. Here's what I should be paid for that work. Uh, those documents again, we're never introduced instead in an effort to work damages here. The district court made this inference that, uh, is a step too far under Florida law and the required burden of proof. President says that in regard to calculation of these damages, all that is required is a determination that's made with reasonable certainty and, uh, there doesn't have to be an exact calculation. Well, uh, under the, that's true. Your honor, uh, you got a little wiggle room in claiming your damages. You don't have to prove it to the penny would make my job very difficult if you did, but under the Austin development case, which is a Florida DCA in 1989 case, the party that says right in that case, the party seeking damages must present evidence to justify damages in a definite amount. What does definite amount mean here? This is a step too far. It's not definite. It's just sort of guessing as to what the division of that replacement subcontractors contract was, how they built for that work. And you did raise a good point, your honor. We don't really know how much it is that they build for the manufacturer of the goods in that case. I doubt it was a dollar obviously, but was it lower than us? We'll never know because that documentation was never introduced to trial. So, so can you help me out of this hole that I've fallen into? Um, I thought that, so I thought the district court found that all rich could have used the 53% of the panels manufactured by you. That is correct, your honor. So am I wrong to think, and frankly, this, I mean, this may be cold comfort to you because it's a proverbial flea on the hair of the tail of the dog in this case, but, um, it's relatively small change, but am I wrong to think that the district court should have netted out what spring was going to charge them for the remaining 47% minus what you were going to do it for? That seems like an approach that will work, uh, your honor. I don't think it works within the inferences that the court was making though, unfortunately, um, regarding how he got there for the way he got there, I think it was pretty similar to how counsel for, for older described it. Um, just take the manufacturer amount that he inferred was allocated to spring times it by, uh, 47%. Boom. That's what you get. Um, but your approach is a little bit of a flea on the dog, so to speak. But yeah, uh, I would agree with that approach and I see him out of time. I don't want to leave any questions unaddressed, but if you have anything else, I'm happy to address it. Otherwise, uh, PRC respectfully requests this court to reverse the district court's decision awarding damages to old rich, um, and uh, under judgment for PRC on, uh, the issues of liability. Thank you counsel. Thank you for your time. The court will be in recess until nine o'clock.